UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 07-360-KSF

GENESIS MEDICAL IMAGING, INC.                                                    PLAINTIFF

v.                              **PRELIMINARY INJUNCTION ORDER**

PERRY M. DeMARS and
PMD SERVICES, LLC                                                               DEFENDANTS

\* \* \* \* \* \* \* \* \* \* \* \*

Currently before the Court is the motion of the plaintiff, Genesis Medical Imaging, Inc.

("Genesis"), for a preliminary injunction against the defendants, Perry M. DeMars and PMD

Services, LLC (collectively "DeMars") [DE # 11].  A hearing on Genesis' motion for preliminary

injunction was held on February 27, 2008.  For the reasons set forth below, the Court will grant

Genesis' motion.

I.       **FINDINGS OF FACT**

Founded in 1998, Genesis is a national, independently-owned company engaged in the sale

and service of magnetic resonance imaging ("MRI") and computerized tomography ("CT") scanning

equipment for diagnostic use in hospitals, clinics, medical offices, and other similar facilities.

Genesis employs over 75 people, including approximately 24 field service engineers ("FSE").  The

FSE's service MRI and CT equipment for Genesis' customers through preventative maintenance on

a monthly, bi-monthly, or quarterly basis.  Genesis also dispatches FSE's to its customers on an as-

needed basis.  Genesis requires that all employees with access to sensitive information or proprietary

information execute a Non-Compete Agreement as a precondition to their employment with Genesis.

In November of 2004, DeMars was terminated from his employment at General Electric ("GE"), where he serviced MRI and CT equipment, and satellite and microwave communications. He was subsequently hired by Genesis in February 2005 as an FSE. In this position, DeMars was responsible for providing technical support and service to customers primarily in Kentucky, but it was understood and DeMars accepted that he would occasionally be required to travel nationwide to serve as a backup FSE when other FSE's were on vacation or otherwise unavailable, or when Genesis obtained new customers in geographic areas without a dedicated FSE. The Non-Compete Agreement executed and delivered by DeMars to Genesis at the time of his employment provides in pertinent part as follows:

> (a)      I Perry M. DeMars hereby agree that during the period of my employment with Genesis Medical Imaging, Inc. (Genesis) [I] will not engage in any business activity, directly or indirectly, which competes or interferes with that of Genesis, nor assist in any way any competitor of Genesis.
>
> * * * *
>
> (c)      I acknowledge and agree that I shall have during the course of my employment access to confidential books, records, data, customer lists and information developed and used in the course of the business of Genesis and which will be disclosed to employees in confidence. I hereby agree that I will not, during or after my employment, disclose these items or other confidential information to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever. I also agree that upon my termination of employment with Genesis, for any reason whatsoever, I will return forthwith to Genesis, all papers, books, customer and vendor lists and any other documents and data belonging to or related to the business of Genesis.
>
> (d)      For a period of two (2) years following my termination of employment with Genesis, for any reason whatsoever, I shall not individually, or while employed by, or as a consultant or independent contractor with any corporation in the United States, canvas, solicit, divert, take away, or interface with Genesis' customers or perspective [sic] customers with whom Genesis has done business with or has had significant proposals outstanding with during twenty-four (24) months preceding the date of termination.

(e)     In event of an actual or threatened breach by employee of any of the provisions in this Agreement, it is expressly understood that Genesis will pursue compensation to the extent of the injury sustained.  Accordingly, the undersigned agrees that in event this agreement is breached, s/he will be responsible for, and shall pay, any and all attorneys fees, expenses and costs incurred by Genesis Medical Imaging, Inc.

Thus, in addition to providing a provision prohibiting DeMars from competing against Genesis, the Non-Compete Agreement also contained a non-solicitation provision and a provision protecting Genesis' confidential information.  DeMars testified that he signed the Non-Compete Agreement voluntarily and that he had ample time to review the Non-Compete Agreement prior to signing.

DeMars officially began work for Genesis on March 1, 2005, and continued his employment with Genesis until he voluntarily resigned effective August 15, 2006.  During his approximately 16 months of employment at Genesis, DeMars was assigned to service a number of Genesis' customers including Core Medical, Inc. dba Imatech ("Core Medical").  Core Medical was headquartered in Missouri and operated several MRI/CT facilities, including a medical office known as Commonwealth Orthopedics located in Crestwood, Kentucky.  DeMars serviced the equipment at Commonwealth Orthopedics in June and July 2006.  Core Medical LLC, a sister company, also operated Neosha Valley Imaging in Chenault, Kansas, and contracted with Genesis for service there.

DeMars was also assigned to service MRI/CT equipment at three facilities known as Dayton Medical Imaging, located in Vandalia, Ohio, Englewood, Ohio, and Centerville, Ohio, managed by Presgar Asset Management ("Presgar").  DeMars serviced all three of Dayton Medical Imaging locations on a regular basis.  DeMars also serviced Genesis' customer M.S. Community, located in Kentucky.

As an FSE for Genesis, DeMars periodically received a list of Genesis' customers, with selected contract information, including customer contact name, phone number, address, pricing information, and preventative maintenance schedule.  DeMars understood that this information was considered confidential by Genesis.

DeMars was living in Lexington, Kentucky when he was originally hired by Genesis. However, in June 2006 Genesis asked DeMars if he was willing to move to Michigan.  He rejected the initial offer.  DeMars then countered with a salary package he described as "ridiculous, but a second offer meeting DeMars' demands was subsequently tendered, and on July 26, 2006, DeMars indicated that the salary and move allowance was in order, but that he was not yet ready to commit. DeMars was then on vacation leave from July 25 through July 30, 2006.  On August 1, 2006, DeMars emailed that he was tied up with family business.

Between August 1 and August 12, 2006, DeMars was supposed to be servicing Genesis customers, but he did not submit any report indicating any customer service.  On August 11, 2006, DeMars filed a name change with the Kentucky Secretary of State to change the name of his company, Perry M. DeMars Trucking LLC[1], to PMD Services LLC.  Then, on August 13, 2006, DeMars emailed Genesis' president, vice-president, and several FSE's his notice of resignation effective August 15, 2006, stating that for "personal reasons I need to terminate my employment. Due to circumstances beyond my control I need to take care of family business . . . it cannot be avoided . . . if and when my situation improves or changes, I will contact you about possible reemployment."

---

[1]Perry M. DeMars Trucking LLC was a side business operated by DeMars in which he provided hauling services.

The evidence reveals that since at least mid-July 2006, DeMars was making arrangements to leave Genesis and form his own competing business. For instance, in July 2006, while employed by Genesis, DeMars was communicating with Core Medical personnel to service facilities it owned or managed in Kentucky and at least two other states. In fact, DeMars entered into contracts to provide services to Core Medical's facilities beginning as early as August 1, 2006. DeMars was also in communication with personnel of Presgar, another customer of Genesis, in August 2006 and began to service Presgar's MRI equipment. The evidence also reveals that DeMars has obtained and has been using Genesis' proprietary computer billing and customer software for his own clients.

On October 26, 2007, Genesis filed its complaint. Specifically, Genesis alleges that DeMars is now providing technical support at three locations previously serviced by DeMars while employed at Genesis, namely Dayton Medical Imaging, Core Medical (Imatech), and M.S. Community Health. Genesis' complaint asserts claims for breach of contract, aiding and abetting breach of contract, tortious interference with contract, and injunctive relief. Genesis has also filed the instant motion for preliminary injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## II.   CONCLUSIONS OF LAW

As this Court has previously noted, "[a] preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved." *ACLU v. Mercer County, Kentucky*, 219 F. Supp.2d 777, 781 (E.D. Ky. 2002). According to the Sixth Circuit, the four factors a court must balance when considering whether to grant a motion for a preliminary injunction are as follows:

(1) the likelihood of the [movant's] success on the merits;

(2) whether the injunction will save the [movant] from irreparable injury;

(3) whether the injunction would harm others; and

(4) whether the public interest would be served.

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995) (citations omitted). The Sixth Circuit has further stated that "[a] district court is required to make specific findings concerning each of the four factors, unless fewer are dispositive of the issue." *Id.* (quotation marks omitted).

> For example, a finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at minimum, show[n] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.

*Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399-400 (6th Cir. 1997) (citations and quotations omitted). In general, "the degree of likelihood of success that need be shown to support a preliminary injunction varies inversely with the degree of injury the [movant] might suffer." *Doe v. Sundquist*, 106 F.3d 702, 707 (6th Cir. 1997). "Moreover, the four factors are not prerequisites to be met, but rather must be balanced as part of a decision to grant or deny injunctive relief." *Performance Unlimited*, 52 F.3d at 1381 (citing *In re DeLorean Motors Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).

The party seeking the preliminary injunction bears the burden of producing evidence of the four factors enumerated above. However, "[a] party . . . is not required to prove his case in full at a preliminary injunction hearing . . . ." *In re DeLorean*, 755 F.2d at 1230 (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). Further, any "ruling at the preliminary injunction stage does not necessarily bind the Court to rule similarly" on later dispositive motions. *Mercer County*, 219 F. Supp.2d at 781 (citing *Six Clinics Holding Corp.*, 119 F.3d at 400).

-6-

### B.       Likelihood of Success on the Merits

Under this framework, the Court first considers whether Genesis is likely to succeed on its claims.  Genesis' First Amended Complaint asserts three causes of action: (1) breach of contract based on the Non-Compete Agreement, including confidentiality and non-solicitation obligations; (2) violation of the Kentucky Uniform Trade Secret Act ("KUTSA"); and (3) tortious interference.[2] Courts in Kentucky have generally upheld covenants not to compete provided that "they are reasonable in scope and in purpose." *Hall v. Willard & Woosely*, 471 S.W.2d 316, 317 (Ky. 1971). Furthermore, "[r]easonableness is to be determined generally by the nature of the business or profession and employment, and the scope of the restrictions with respect to their character, duration and territorial extent." *Id*. at 317-18.

A non-compete agreement is reasonable if the scope and duration of the agreement are limited to only what is necessary to protect the employer from unfair competition.  According to one Kentucky court:

> [a]n agreement in restraint of trade is reasonable if, on consideration of the subject
> matter, the nature of the business, the situation of the parties and the circumstances
> of the particular case, the restriction is such only as to afford fair protection to the
> interests of the covenantee and not so large as to interfere with the public interests
> or impose undue hardship on the party restricted.

*Ceresia v. Mitchell*, 242 S.W.2d 359, 364 (Ky. 1951) (quoting 17 C.J.S., Contracts § 247).  It is therefore up to the Court to determine whether the scope and duration of the Non-Compete Agreement are reasonable based upon the specific facts of this case.

---

[2]The motion for preliminary injunction, response, and reply do not specifically address the KUTSA and the tortious interference claims; however, Genesis' proposed order does address each of these claims.

The Non-Compete Agreement, executed voluntarily by DeMars at the time he began his employment, is limited to two-years in duration. While it is nationwide in geographic scope, Genesis employs approximately 24 FSE's which service customers in locations that span the United States. DeMars himself worked on behalf of Genesis in several states, and worked for many clients with offices in other states. The inclusion of a geographic term of anything less than the entire United States would permit DeMars to solicit prospective customers headquartered in another region, but then provide the services in Kentucky to circumvent the Non-Compete Agreement. Moreover, the Non-Compete Agreement is narrowly tailored to restrict DeMars from competing with Genesis' customers or customers with whom Genesis had a significant proposal twenty-four months prior to his termination. It does not prevent DeMars from working at other MRI/CT facilities or with Genesis' direct competitors. Accordingly, inasmuch as the Non-Compete Agreement is not overly broad, Genesis is likely to succeed on its claim of breach of the Non-Compete Agreement.

Turning next to Genesis' claim that DeMars used confidential information, including contact information and pricing, to solicit its customers, the Court finds that Genesis is likely to succeed on this claim as well. Kentucky law allows for injunctions for trade secret misappropriation under the Kentucky Uniform Trade Secret Act, KRS § 365.880 if DeMars misappropriated or is likely to misappropriate information that is a trade secret. KUTSA defines a trade secret as:

> [I]nformation, including a formula, pattern, compilation, program, data, device, method, technique or process that:
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

K.R.S. § 365.880(4). A trade secret is misappropriated if the person who uses the information knows or has reason to know, at the time of disclosure or use, that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit is use. *Id.* § 365.880(2).

The evidence reveals that DeMars has used customer information developed through a substantial amount of time, effort, and expense by Genesis' salesmen who attended trade shows, and called upon and developed relationships with potential customers to solicit Core Medical, Presgar, and M.S. Community. DeMars admits he had access to Genesis' pricing information, the names of its customers, their contact information, their schedule for preventative maintenance, the hourly rate charged to the customer, and the overtime rate charged to the customer. He used this information to solicit new business and to charge Genesis' former clients the same or lower hourly rate. DeMars also admits that he is using a template owned by Genesis to input the service hours for customers, compute his hourly rate, and then generate a customer report. Certainly, the evidence is clear that DeMars misappropriated Genesis' confidential, trade secret, information and Genesis is therefore likely to succeed on this claim.

Finally, Genesis is also likely to succeed on its tortious interference claim. Under Kentucky law, the plaintiff in a tortious interference case must prove a contract, the defendant's knowledge of the contract, the defendant's intent to breach it resulting in damages, without privilege or jusitfication. *See NCAA v. Horning*, 754 S.W.2d 855, 857 (Ky. 1988). DeMars, a party to the Non-Compete Agreement, knew that Genesis had contracts with Core Medical, Presgar, and M.S. Community. Even if DeMars believed these contracts were terminated, the Non-Compete Agreement precludes DeMars from soliciting or interfering with these customers for two years.

DeMars' conduct falls squarely within the ambit of tortious interference and Genesis is thus likely to succeed on this claim as well.

DeMars argued that the Non-Compete Agreement cannot be enforced against him because other FSE's have left Genesis and violated their Non-Compete Agreements, but Genesis has not pursued any legal remedies against them – i.e., Genesis cannot "selectively enforce" its Non-Compete Agreements against DeMars alone. DeMars has not, however, provided any authority to this effect to the Court. Assuming that "selective enforcement" is available as a defense, DeMars simply did not provide any facts to support such a defense. He argues that other FSE's have left Genesis and gone to work for competitors, but the Non-Compete Agreement does not prohibit this. He has not offered any evidence that any other former employee of Genesis has left and solicited Genesis' customers.

The Court also rejects DeMars' argument that the Non-Compete Agreement is ambiguous in its use of the word "customers." DeMars argues that the word "customer" can be interpreted to mean a particular MRI/CT machine such that if a company such as Core Medical owns multiple machines, but Genesis only has a contract to service one of those machines, the "customer" should not be considered Core Medical, but the machine that is under contract. The Court does not consider this a reasonable interpretation of the Non-Compete Agreement such that an ambiguity precludes its enforcement. The only reasonable interpretation of the word "customer" as used in the Non-Compete Agreement is that it refers to a company, not a particular site or machine. The facts as developed at the hearing further indicate that DeMars worked with one individual at Core Medical – a Mr. Stiles – to obtain service contracts for both sites that Genesis had under contract and additional sites.

The Court also finds that the Non-Compete Agreement is clear in that it applies to Genesis' customers regardless of whether Genesis had a full service contract with them or whether Genesis simply serviced the customer on a "time and materials" basis. The Non-Compete Agreement clearly prohibited DeMars from soliciting or interfacing with any of Genesis' customers for 24 months after termination of his employment.

### (C) Irreparable Harm

The Sixth Circuit has recognized that the loss of goodwill and fair competition that result from an employee's breach of a restrictive covenant could support a finding of irreparable harm that would justify the issuance of an injunction. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). Moreover, if DeMars is allowed to continue to compete with Genesis and take advantage of and misuse confidential information obtained from Genesis, then it will suffer a loss of goodwill and will be competitively disadvantaged. *See IDS Financial Services, Inc. v. Smithson*, 843 F. Supp. 415, 418 (N.D. Ill. 1994). The resulting irreparable harm to Genesis from DeMars breach of the Non-Compete Agreement weighs in favor of granting injunctive relief.

### (D) Harm to Third-Parties

Genesis contends that no third-parties will be harmed by the granting of an injunction and the defendants fail to point to any third-parties who would be harmed by entry of a preliminary injunction. This prong of the injunctive relief analysis favors Genesis.

### (E) The Public Interest

The public has an interest in the promotion of fair competition and the discouragement of unfair competition. *Basicomputer*, 973 F.2d at 512. The enforcement of a restrictive covenant is not inconsistent with public policy so long as enforcement would not cause serious inequities to result.

*Daniel Boone Clinic, P.S.C. v. Dahan*, 734 S.W.2d 488, 490 (Ky.App. 1987).   Enjoining DeMars

from further solicitation of Genesis' customers or interfering with Genesis' contractual relations will

serve the public by promoting enforcement of contractual obligations, and preventing unfair

competitive advantage from using information acquired at the expense of a prior employer.

Inasmuch as the Non-Compete Agreement is narrowly tailored to Genesis' own customers and any

customers with whom Genesis has made a significant proposal within 24 months prior to DeMars'

departure, DeMars is free to compete for the business of other health care entities that offer MRI/CT

diagnostic services in the entire United States and abroad.   Thus, the Court finds that the issuance

of preliminary injunctive relief is in the best interest of the public.

## III.   CONCLUSION

Based on the parties' pleadings and the evidence and argument at the hearing, the Court finds

that Genesis has shown that it has a likelihood of success on the merits of the case.   Additionally,

the other factors weight in favor of granting the preliminary injunctive relief.   Thus, the Court, being

fully and sufficiently advised, **HEREBY ORDERS**:

    (1)    Genesis' motion for preliminary injunction [DE # 11] is **GRANTED**; and Perry M. DeMars and PMD Services, LLC, and anyone associated or acting in concert with them, are enjoined as follows:

        (a)    DeMars will not engage in any employment, consultation or association with any company, including PMD Services, that provides any MRI/CT service to any Genesis customer including Core Medical Inc. f/d/b/a Imatech, Core Medical LLC, and Presgar Asset Management, including the three Dayton Medical Imaging facilities located in Vandalia, Centerville, and Edgewood, Ohio;

        (b)    DeMars is directed to provide Core Medical (Inc. and LLC) and Presgar with a copy of this Order within three (3) business days of service of the Order and inform them that he and PMD Services can no longer provide services to either Core Medical or Presgar after five business days from the date of

delivery of this Order to Core Medical and Presgar.  No later than ten (10) days after entry of this Order, PMD and DeMars must cease all services to Core Medical (Inc. and LLC) and Presgar and any persons or entities associated or acting in concert with them.  These facilities must engage other providers for MRI and CT services;

(c)     DeMars is enjoined from calling upon or soliciting any customer of Genesis with whom DeMars performed any services while employed by Genesis;

(d)     DeMars is enjoined and prohibited from communicating or disclosing or otherwise misappropriating any confidential, proprietary and/or trade secret information acquired from and through Genesis; and

(e)     DeMars is enjoined from violation of any other terms and provisions of the Non-Compete Agreement.

(2)   As security for this Preliminary Injunction, Genesis **SHALL POST** security in the amount of $1,000; and

(3)   This Order shall **REMAIN IN FULL FORCE AND EFFECT** until such time as the Court orders or the parties consent to withdrawal.

This February 28, 2008.

**Signed By:**

_**Karl S. Forester**_   $KSF$

**United States Senior Judge**

-13-